IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| D & S TURBINE INTERNATIONAL, INC., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-2158 |
| | § | |
| RESEARCH MANAGEMENT SYSTEMS, L.C., | § | |
| | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, D & S Turbine International, Inc. (Turbine), filed this action alleging breach of contract, quantum meruit, and fraudulent inducement against defendant Research Management Systems, L.C. (RMS).[1]  Pending before the court are Defendant's Motion to Dismiss for Lack of Personal Jurisdiction and Venue (Docket Entry No. 9), Plaintiff's Response (Docket Entry No. 21), Plaintiff's Motion for Sanctions (Docket Entry No. 25), Plaintiff's Supplemental Motion for Sanctions and First Supplement to its Motion for Sanctions (Docket Entry Nos. 28 and 30), Defendant's Reply in Support of Motion to Dismiss and Response in Opposition to Motion for Sanctions (Docket Entry No. 29), Defendant's Response to Supplemental Motion for Sanctions (Docket Entry No. 32), and

_____

[1]Plaintiff's Original Complaint, Docket Entry No. 1.

Plaintiff's Surresponse in Support of its Motion for Sanctions and Denial of Defendant's Motion to Dismiss (Docket Entry No. 33).  For the reasons explained below, the court will grant Defendant's Motion to Dismiss and deny Plaintiff's Motion for Sanctions.

## I.  __Turbine's Allegations__

According to Turbine's complaint,[2] RMS is a company that coordinates contingency support for the Air Force as part of the Air Force Contract Augmentation Program (AFCAP).  RMS's principal office is in Panama City, Florida.  The Air Force uses AFCAP to facilitate worldwide support for noncombatant military operations. AFCAP has a one-year contract with RMS that includes an option for up to seven one-year extensions.  In February of 2003 the U.S. Agency for International Development (USAID) awarded AFCAP a contract for logistical support in Iraq.

One of the public works projects undertaken by RMS, USAID, and AFCAP in Iraq is restoration of the Al Karkh Water Treatment Plant ("Plant"), which is located approximately 25 miles outside of Baghdad.  This plant cleans and generates all of the water for Baghdad and the surrounding areas.  On February 29, 2004, RMS agreed to purchase from Turbine a Pratt Whitney Model FT4A-11 Mobile Pac (Pratt Whitney) for $5.5 million.  The Pratt Whitney, also referred to as the generator, is the turbine that would

---

[2]Plaintiff's First Amended Complaint, Docket Entry No. 31.

operate the plant.     Turbine is a small corporation based in Houston, Texas, that specializes in brokering international deals for the sale of heavy equipment and machinery.     David Samaha, Turbine's president and chief negotiator, signed the RMS contract.

On March 25, 2004, Samaha agreed that Turbine would provide additional products and services to RMS.  The memorandum confirming this agreement offered RMS products and services, including the Pratt Whitney, totaling approximately $8.8 million.  The additional products included a Chiller Unit, a Pulse-Jet Self Cleaning Filter, and spare parts.     The services included the installation, commission, and training on the Pratt Whitney and maintenance for the first year.

RMS sent Turbine a Purchase Order contract for the goods and services.  The Purchase Order contract included terms of payment, installation, and shipping.  The Purchase Order contract noted that other vendors would provide the following services:  (1) the flat concrete bed on which the Pratt Whitney would sit, (2) the fuel line to the generator, and (3) the electrical lines.

Turbine assembled the Pratt Whitney in Jacksonville, Florida, for RMS's approval, and RMS was then responsible for shipping it to Iraq.  Turbine contracted with Turbine Logistics to install the generator, supervise the installation of the chiller and filter, and train the personnel.  Turbine Logistics' principal, Kenneth Welch, went to Iraq to oversee the start-up of the generator along

with three Turbine engineers.  Welch estimated that starting up the
generator would take 12 to 15 days.  This portion of the job
actually took 7 weeks.

RMS agreed to provide Turbine representatives in Iraq with
transportation, food, lodging, and security.  When Turbine's
electrical engineer and contractor arrived in Iraq they were not
provided transportation to Karkh and had to find their own way to
the site.  Additional problems emerged.  There was no satellite
communication between the site and Turbine.  The housing unit for
the air filter was mangled.  Power supplies were stolen.  The
computer ribbon was damaged.  Cables for fans were missing.  The
fittings on the filter hose had been stolen.  The Control System
had been damaged and sabotaged.  The Chiller suffered an improvised
explosive device attack.  The electrical grid necessary to install
the generator was not properly set up.

Although RMS provided cranes, equipment, and local manpower,
it did not provide money to pay the local laborers.  Turbine paid
the laborers.  Security was inadequate at the plant.  The lodging
provided by RMS consisted of one building housing all four of the
Turbine contractors, 17 to 30 soldiers, and 22 Iraqi Nationals.
The  building had only one shower with a sub-standard restroom for
everyone's use.  RMS provided no food or water.

Turbine's personnel improvised repairs to damaged equipment.
RMS failed to install the Chiller and the Filter, so Turbine's

-4-

personnel also installed these parts.  When the Turbine personnel attempted to start the generator they discovered problems with the mainframe computer for the generator.  Arranging for its replace-ment took more than a month.

Repairing the equipment put Turbine behind schedule and over budget.  Turbine sought reimbursement for its additional costs from RMS.  RMS agreed to pay, but failed to do so.  Turbine gave RMS an ultimatum:  either RMS pay the outstanding invoices from Turbine, or Turbine would pull its personnel from Iraq.  RMS demanded that Turbine complete the work.  Turbine refused and ordered its person-nel to leave Iraq.  RMS sent Turbine a notice of termination and cure, demanding that Turbine complete the contract.  Turbine offered to keep its personnel in Iraq if RMS would pay the amount necessary for completion of the job.  RMS refused, and Turbine's personnel returned to the United States.

Turbine sued RMS alleging breach of contract, quantum meruit, and fraudulent inducement.

## II.  <u>Standard of Review</u>

The burden rests on the plaintiff to establish that the court has personal jurisdiction over a nonresident defendant who moves for dismissal.  <u>Wilson v. Belin</u>, 20 F.3d 644, 648 (5th Cir. 1994). The plaintiff meets this burden by presenting a prima facie case

that personal jurisdiction is proper.[3] <u>Jones v. Petty-Ray</u>
<u>Geophysical Geosource, Inc.</u>, 954 F.2d 1061, 1067 (5th Cir. 1992).
A district court may consider affidavits and other properly
obtained evidence when making its determination but must accept the
uncontroverted allegations in the complaint as true, and resolve
all factual conflicts in favor of the plaintiff. <u>Wilson</u>, 20 F.3d
at 648.

A federal court sitting in diversity may exercise personal
jurisdiction over a defendant to the extent permitted by the forum
state's law. Fed. R. Civ. P. 4(e)(1), (h)(1) and (k)(1); <u>see also</u>
<u>Central Freight Lines Inc. v. APA Transport Corp.</u>, 322 F.3d 376,
380 (5th Cir. 2003). The Texas long-arm statute allows personal
jurisdiction to the full extent allowed by the Due Process Clause
of the Fourteenth Amendment. <u>See</u> 2 Tᴇx. Cɪv. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ Aɴɴ. §
17.042; <u>Schlobohm v. Schapiro</u>, 784 S.W.2d 355, 357 (Tex. 1990).
Thus, the typical two-step analysis for personal jurisdiction in
diversity cases contracts to a one-step analysis of whether

---

[3]Defendant argues that when discovery has been conducted,
plaintiff must prove jurisdiction by a preponderance of the
evidence. <u>See, e.g.</u>, <u>Pieczenik v. Dyax Corp.</u>, 265 F.3d 1329, 1334
(Fed. Cir. 2001). Defendant's Reply, Docket Entry No. 29, p. 5
n.2. The court declines to hold plaintiff to this increased burden
of proof because, as defendants admit, the Fifth Circuit has not
adopted this standard. The Fifth Circuit, while not directly
addressing this issue, has stated that "[w]hen, as here, the
district court conducted no evidentiary hearing, the party seeking
to assert jurisdiction must present sufficient facts as to make out
only a prima facie case supporting jurisdiction." <u>Alpine View Co.</u>
<u>Ltd. v. Atlas Copco AB</u>, 205 F.3d 208, 215 (5th Cir. 2000).

exercising jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment.  <u>Alpine View Co. Ltd. v. Atlas Copco AB</u>, 205 F.3d 208, 214 (5th Cir. 2000).

The Due Process Clause of the Fourteenth Amendment permits the exercise of personal jurisdiction over a nonresident defendant when

> (1)  the defendant has had "minimum contacts" with the forum state, and
>
> (2)  the exercise of jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice."

<u>See</u> <u>International Shoe Co. v. Washington</u>, 66 S.Ct. 154, 158 (1945).

### III.  <u>In Personam Jurisdiction</u>

Minimum contacts exist when a defendant's contact with the forum state is such that "he should reasonably anticipate being haled into court there." <u>Burger King Corp. v. Rudzewicz</u>, 105 S.Ct. 2174, 2183 (1985) (quoting <u>World-Wide Volkswagen Corp. v. Woodson</u>, 100 S.Ct. 559, 567 (1980)).  The minimum contacts requirement can be analyzed by viewing contacts that give rise to either specific or general jurisdiction. <u>Gundle Lining Construction Corp. v. Adams County Asphalt</u>, 85 F.3d 201, 205 (5th Cir. 1996).

### A.    General Jurisdiction

General Jurisdiction subjects a defendant to a court's jurisdiction regardless of whether the controversy is related to the defendant's activities within the forum.  <u>See</u> <u>Helicopteros</u>

<u>Nacionales de Columbia, S.A. v. Hall</u>, 104 S.Ct. 1868 (1984). To make the required prima facie showing, Turbine must demonstrate that RMS's contacts with Texas unrelated to the litigation are substantial, continuous, and systematic. <u>See</u> <u>Helicopteros</u>, 104 S.Ct. at 1872-73; <u>Alpine View</u>, 205 F.3d at 217.

The court assesses whether general jurisdiction exists by evaluating a defendant's contacts with the forum over a reasonable number of years, up to the date the suit was filed. <u>Access Telecom, Inc. v. MCI Telecommunications Corp.</u>, 197 F.3d 694, 717 (5th Cir. 1999). The court examines a defendant's contacts with the forum "in toto" rather than examining each contact in isolation. <u>Id.</u>

Turbine submits evidence that in the past eight years RMS has had the following contacts with Texas: (1) RMS hired three people from Texas to work outside the United States; (2) RMS had a business relationship with Selrico Services, Inc. (Selrico) and GE Packaged Power, Inc. (GE), both Texas-based companies; (3) RMS contracted with Turbine -- the relationship forms the basis of the present lawsuit; (4) RMS advertised in <u>Air Force Times</u>, a news publication that was distributed in Texas; and (5) RMS representatives visited Texas six to seven times for such purposes as attending an educational conference and soliciting business.[4]

_____

[4]Plaintiff's Response, Docket Entry No. 21, pp. 13-17. There is some dispute over Turbine's claims that RMS advertised in the <u>Air Force Times</u>. Turbine bases this claim on statements made by two RMS employees. Both of these employees, however, indicated
(continued...)

The court will begin its analysis with the trips by RMS
personnel to Texas.  Although RMS did send representatives to Texas
to attend conferences and solicit business, these trips did not
result in any direct business for RMS.[5]  See Central Freight Lines,
322 F.3d at 381 (finding no general jurisdiction when "even though
APA . . . apparently sends sales people to the state on a regular
basis to develop business, negotiate contracts, and service
national accounts, APA has never actually operated any trucks or
picked up or delivered any freight in Texas").  Furthermore, these
trips were isolated events, occurring six to seven times over eight
years.

The evidence suggesting that RMS advertises for employees in
Texas shows only that RMS advertises in one national journal, Air
Force Times, which is distributed in Texas.  See Wenche Siemer v.
Learjet Acquisition Corp., 966 F.2d 179, 182 (5th Cir. 1992)
(finding no general jurisdiction when defendant had advertised in
forum state through national journals).  There is no evidence as to
how frequently RMS ran ads in Air Force Times, the amount spent on

_____

[4](...continued)
that Linda Dillon was the person most knowledgeable about RMS's
advertising.  In her deposition, Dillon stated unequivocally that
RMS does not advertise in the Air Force Times.  Id. at Exhibit K,
10:15-22.

[5]Deposition of Dwight E. Clark, 57:11-59:10, contained in
Plaintiff's Response, Docket Entry No. 21, Exhibit E attached
thereto.

these ads, the length of times the ads were placed, or the results of these ads.  See Access Telecom, 197 F.3d at 717-18; Gardemal v. Westin Hotel Co., 186 F.3d 588, 596 (5th Cir. 1999).

The three people hired from Texas do not establish RMS's systematic and continuous contacts with Texas.  Any connection RMS had with Texas by virtue of these three individuals is tenuous at best, given that RMS did not go to Texas to recruit them and that their work was performed outside of Texas.[6]  Because they work outside of Texas, these three individuals do not establish that RMS has employees in Texas.

Turbine has presented evidence that RMS has limited business relationships with three Texas entities:  Turbine -- regarding the disputes at issue in this case; Selrico -- a company that serves as RMS's subcontractor for food services; and GE -- a company that agreed to provide RMS with equipment and services for Iraq. Turbine points to RMS's contract with Selrico, a Texas company, as evidence that RMS has a systematic, continuous relationship with Texas.   Selrico prepared and served meals in New Orleans, Louisiana, and outside of the United States.[7]  Turbine argues that

---

[6]Deposition of Linda Dillon, 12:7-12:11, 15:20-16:20, contained in Plaintiff's Response, Docket Entry No. 21, Exhibit K attached thereto.  The employees from Texas work outside the United States in Qatar and Kyrgyzstan.

[7]Deposition of James A. Jackson, Jr., 23:15-26:6, contained in Plaintiff's Response, Docket Entry No. 21, Exhibit A attached thereto.

RMS's contracting with Selrico during the two or three years prior to the filing of this lawsuit "demonstrates RMS' continuous and systematic contact with Selrico for the last 2 or 3 years."[8]

Turbine conflates the legal standard. The general jurisdiction analysis does not focus on whether RMS had continuous and systematic contact with a domiciliary of the forum state, but whether RMS had continuous and systematic contact with the forum state. Contracting with a Texas entity is relevant to this analysis, but is not dispositive. Furthermore, despite the fact that Selrico is a Texas-based company, its contract with RMS does not establish that RMS had continuous and systematic ties with Texas. Contracting with a Texas business when the performance of the contract occurs out-of-state does not constitute systematically and continuously doing business in Texas. See LeBlanc v. Patton-Tully Transp., LLC, 138 F.Supp.2d 817 (S.D. Tex. 2001).

The same analysis applies to RMS's contract with Turbine, out of which this lawsuit arises. The contract between Turbine and RMS does not significantly add to RMS's contacts with Texas. Turbine argues, however, that the fact that the lawsuit arises from a controversy involving RMS's contacts with Texas is relevant to the general jurisdiction inquiry. See Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 779 (5th Cir. 1986). While the court agrees that

---

[8]Plaintiff's Response, Docket Entry No. 21, p. 16.

this factor is relevant, this case is distinguishable from Holt Oil, where there was general jurisdiction.  Id.  In Holt Oil the Fifth Circuit found systematic and continuous contacts with the forum state when a defendant attended college in and used to be employed in the state, owned real estate in the state, visited the state frequently, and transacted a great deal of business in the state, including holding the position of director of a company based in the state.  Id. at 773.  In Holt Oil the defendant had "constant and extensive personal and business connections with Texas throughout his adult life." Id. at 779.  The relevance of the fact that the controversy arose out of the defendant's business contacts in the forum state in Holt Oil was viewed in light of these other extensive contacts.  In this case, the other contacts with Texas do not rise to the level of the nature and the frequency of the contacts in Holt Oil.

Finally, Turbine submits evidence that RMS entered into a contract with GE, a Texas-based company, to provide two generators, equipment, and technical advising services for RMS's use at the Karkh Water Treatment Plant in Iraq.  This contract is the subject of a lawsuit currently pending in federal court in the Northern District of Georgia.[9]  RMS's contacts with Texas as a result of this contract are minimal at best:  RMS did nod not solicit the

---

[9]Plaintiff's First Supplement to its Motion for Sanctions, Docket Entry No. 30, Exhibit 2A attached thereto.

relationship with GE; at the time of the contract the generators were located in Athens, Greece; the generators were destined for use in Iraq; RMS did not negotiate the contract with GE; no RMS representative traveled to Texas in connection with the contract.[10]

The Fifth Circuit has distinguished doing business "in" a forum state from doing business "with" a forum state in the context of general jurisdiction. Access Telecom, 197 F.3d at 718. Doing business "with" Texas, even if done systematically and continuously, is not sufficient to confer general jurisdiction over a defendant in Texas. Id. at 717 (noting that "the totality of the contacts suggests that Telmex conducted a great deal of business with Texas, but virtually none in Texas, as such general jurisdiction cannot be shown, even on a prima facie basis). While the three contracts RMS had with residents of Texas might arguably constitute doing systematic and continuous business "with" Texas in the form of doing business "with" Texas entities, they do not constitute doing business "in" Texas. Beyond the mere fact of contracting with Texas entities, any contact with Texas was tangential to the purposes of the contracts, which were for goods or services provided outside of Texas -- Selrico in New Orleans and overseas, GE and Turbine in Iraq.

---

[10]Affidavit of James A. Jackson contained in Defendant's Response to Plaintiff's Supplemental Request for Sanctions, Exhibit B attached thereto.

RMS's contacts, taken together, do not constitute the type of systematic and continuous business activity within the state of Texas that the Supreme Court or other courts have found necessary to subject it to the general jurisdiction of Texas.  In <u>Perkins v. Benguet Consolidated Mining Co.</u>, 72 S.Ct. 413 (1952), the Court found systematic and continuous contacts when a corporation temporarily relocated its principal place of business to the forum state by virtue of conducting directors' meetings in the state, maintaining records and bank accounts in the state, and making important business decisions in the state.  <u>Id.</u> at 419-20.  The contacts RMS has with Texas stand in stark contrast to the facts of <u>Perkins</u>.

There is no evidence that RMS is registered to conduct business in Texas or pays taxes in Texas.  There is no evidence that RMS has any offices, agents, or employees in the state of Texas.  There is no evidence that RMS owns property or facilities in the state of Texas.  There is no evidence that RMS has a bank account in Texas.  <u>See</u> <u>Wilson</u>, 20 F.3d at 651; <u>Wenche Siemer</u>, 966 F.2d at 182; <u>Bearry v. Beech Aircraft Corp.</u>, 818 F.2d 370, 376 (5th Cir. 1987).

Because RMS's contacts with Texas do not, by virtue of their frequency, duration, or nature, rise to the level of systematic and continuous, the court concludes that there is no general jurisdiction over RMS in Texas.

**B.   Specific Jurisdiction**

Specific jurisdiction derives from "the relationship among the defendant, the forum, and the litigation." Shaffer v. Heitner, 97 S.Ct. 2569, 2580 (1977).  The requirement of minimum contacts for specific jurisdiction is satisfied when a defendant has purposefully directed its activities at the forum state, and the litigation results from alleged injuries that arise out of or relate to those activities.  Burger King, 105 S.Ct. at 2183.  For specific jurisdiction to exist "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting business within the forum State, thus invoking the benefits and protections of its laws." Id. (quoting Hanson v. Denckla, 78 S.Ct. 1228, 1239-40 (1958)). Contract-based cases require more than mere contracting with a resident of the forum state to establish specific jurisdiction over a non-resident defendant.  Burger King, 105 S.Ct. at 2185.  See also Dickson Marine Inc. v. Panalpina, Inc., 179 F.3d 331, 337 (5th Cir. 1999).

In examining defendant's contacts with Texas the court takes a realistic approach, looking at "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine if defendants purposefully established minimum contacts with the forum.  Burger King, 105 S.Ct. at 2185; see also Stuart v. Spademan, 772 F.2d 1185, 1193-94 (5th Cir. 1985).

There is no evidence that RMS has any physical ties to Texas other than six to seven brief trips during the course of more than eight years for purposes unrelated to this lawsuit. See Burger King, 105 S.Ct. at 2184 (noting that territorial presence, while not necessary, will enhance a potential defendant's affiliation with a state and reinforce the reasonable foreseeability of suit there). Turbine notes that RMS sent a subcontractor to Houston to inspect the Chiller prior to its shipment to Iraq. Turbine has not, however, presented the court with authority for imputing the actions of a subcontractor to the contractor for jurisdictional purposes. See Freudensprung v. Offshore Technical Servs., Inc., 379 F.3d 327, 346 (5th Cir. 2004) (noting that a plaintiff must overcome the presumption of corporate independence, which defeats the assertion of jurisdiction over one by using the contacts of another).

In the absence of physical ties and territorial presence related to this litigation, Turbine argues that the following contacts with Texas satisfy the minimum contacts prong of specific jurisdiction: (1) Turbine performed part of the contract in Texas, (2) RMS initiated contract negotiations with Turbine in Texas, (3) the interstate communication between RMS and Turbine in Texas was voluminous, (4) one of the contracts signed by the parties contains a Texas forum selection clause, and (5) the parties had a

-16-

continuous and long-term business relationship.  The court will examine each of Turbine's points in turn.

Turbine first argues that the contract envisages and requires performance in Texas.  Despite Turbine's vigorous argument that the contract contemplated Turbine's performance of work in Texas, an examination of the contract reveals that any performance due in Texas was de minimus.  Although Turbine undoubtedly engaged in activities in Texas to meet its obligations pursuant to the contract, this is true almost any time a Texas company contracts with an out-of-state defendant.

The Scope of Work in the Purchase Order contract states that Turbine's performance consisted of installing, commissioning, training, and maintaining the generator.[11]  All of these activities were to take place in Iraq.  The only performance in Texas was the unilateral activity of Turbine.  See Hydrokinetics, Inc. v. Alaska Mech., Inc., 700 F.2d 1026, 1029 (5th Cir. 1983).  The unilateral activity of Turbine in Texas does not constitute purposeful availment by RMS.  Id.  The actual performance Turbine rendered under the contract occurred in Iraq.

Although Turbine argues that RMS reached out to Texas to solicit the sale of the Pratt-Whitney generator, the evidence does not support this allegation.  Turbine cites the deposition of

---

[11]Purchase Order ¶ 7, pp. 4-5, contained in RMS's Reply, Docket Entry No. 29, Exhibit D attached thereto.

-17-

James A. Jackson, RMS's director of logistics, as the evidentiary basis of the solicitation argument.  However, Jackson stated that to the best of his recollection Turbine was brought to his attention by an employee of SCI, one of RMS's subcontractors.[12]

Turbine's argument that voluminous communications between RMS and Turbine in Texas regarding the negotiation and execution of the contract support personal jurisdiction is not persuasive.  As the Fifth Circuit has repeatedly held,

> "the combination of mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant."

Freudensprung, 379 F.3d at 344.  It is not the number but the quality of contacts that demonstrates purposeful availment. Stuart, 772 F.2d at 1194.

Turbine next argues that RMS submitted to jurisdiction in Texas by virtue of one of the contracts entered into between the parties.  Turbine and RMS executed a Non-Circumvention & Non-

---

[12]Deposition of James A. Jackson, Jr., 66:3-68:11, contained in Plaintiff's Response, Docket Entry No. 21, Exhibit A attached thereto.  Turbine cites to a different portion of Jackson's deposition to establish that RMS initiated contact with Turbine in Texas.  However, the question asked was "[a]t some point during the negotiations did RMS representatives contact D&S [Turbine] in Texas to solicit the sale of the generator?"  Id. at 69:9-69:12.  Jackson responded in the affirmative.  This does not establish who initiated the contact between RMS and Turbine.  It merely shows that at some point in the negotiations RMS contacted Turbine in Texas.

Disclosure (NCND) Agreement that contained a Texas forum selection clause.  The actual language of the contract is relevant to the minimum contacts analysis.  <u>See</u> <u>Gundle Lining</u>, 85 F.3d at 205 ("[O]ne factor that might affect the minimum contacts analysis is the actual language present in the contract itself").  While the NCND Agreement does contain a Texas forum selection clause, the NCND Agreement governs only a small portion of the parties' relationship.  It states that "[t]he purpose of this agreement is to prevent and prohibit the disclosure of confidential information to any, and all non-parties to this agreement."[13]  The forum selection clause itself is limited to "any controversy arising under or in relation to the Agreement."[14]  Turbine's lawsuit stems from an alleged breach of the Purchase Order contract, not from a breach of the NCND Agreement; and the Purchase Order contract does not contain a Texas choice-of-law or choice-of-forum provision.

The Purchase Order contract incorporates various attachments.[15] The General Conditions-Purchases Attachment (GC-P) applies to all of the items specified in the Purchase Order except installation and maintenance.  The General Conditions-Construction Services

---

[13]NCND Agreement, p. 1, contained in Plaintiff's Response, Docket Entry No. 21, Exhibit C attached thereto.

[14]<u>Id.</u> at p. 4.

[15]Purchase Order Contract, ¶ 3.0, p. 3, contained in Plaintiff's Response, Docket Entry No. 21, Exhibit D attached thereto.

Order Attachment (GC-C) applies to installation and maintenance. Neither the GC-P nor the GC-C contains forum selection clauses, but both contain a choice-of-law provision.  A choice-of-law provision is a relevant factor in considering whether or not a defendant has minimum contacts with the forum state.  <u>Jones</u>, 954 F.2d at 1069.

The GC-P states that "[t]he definitions of terms used, interpretation of this Agreement, and rights of the parties hereunder shall be construed under and governed by the laws of the jurisdiction wherein Buyer's office is located . . . ."[16]  The GC-C states the following:  "Irrespective of the place of performance, this subcontract will be construed and interpreted according to the federal common law of contracts . . . .  To the extent that the Federal Common law of government contracts is not dispositive, the laws of the state from which Contractor's subcontract is issued shall apply."[17]

The GC-P does not specify where the buyer's office is located. Neither does the GC-C specify what state the subcontract was issued from.  But the Purchase Order contract contains RMS's address at the beginning of the document as Panama City, Florida.  These documents, while unclear as to exactly what law applies, give no indication that the parties intended Texas law to apply.

_____

[16]GC-P, ¶ 16, p. 6, to Plaintiff's Response, Docket Entry No. 21, Exhibit D attached thereto.

[17] <u>Id.</u> at GC-C, ¶ 22.

Because neither the Purchase Order, the GC-P, nor the GC-C invoked Texas law, and the NCND Agreement's limited application restricted the effect of its forum selection clause, the contracts between the parties do not establish that RMS reached out to Texas, or that it should have foreseen being haled into court in Texas.

Turbine also argues that the relationship between itself and RMS was continuous and long-term, involving several transactions. But there is no evidence that RMS and Turbine had any business relationship prior to the negotiations for the sale of the Pratt-Whitney. The contracts at issue did not envisage a long-term, multi-year relationship of the sort enjoyed by the parties in Burger King, 105 S.Ct. at 2186. See also Electrosource, Inc. v. Horizon Battery Techs., Ltd., 176 F.3d 867, 872 (5th Cir. 1999) (finding specific jurisdiction when the actual course of dealing between the plaintiff and defendant involved wide-reaching contacts and contemplated future consequences within the forum state). While RMS and Turbine did enter into multiple contracts, including the NCND Agreement and the Purchase Order contract, this does not establish a continuous and long-term relationship. All of the contracts were related to the objective of providing equipment and services for the Plant in Iraq. The NCND Agreement governs non-circumvention and non-disclosure related to the sale of the Pratt-Whitney.[18] The Purchase Order contract was for the installation and

---

[18]NCND Agreement, p. 2, contained in Plaintiff's Response, Docket Entry No. 21, Exhibit C attached thereto.

commissioning of equipment in Iraq, as well as the training of personnel to run the Plant after taking over the responsibility from Turbine.

There is no indication in the contract or the dealings between the parties that the relationship was intended to extend beyond one year. Turbine's complaint admits as much, stating that Turbine anticipated that the "start-up" work for the generator would take twelve to fifteen days to complete.[19] The work remaining to Turbine under the contract after "start-up" was maintenance, which the contract spells out under the heading "First Year Maintenance."[20] Despite Turbine's attempts to characterize the relationship between RMS and Turbine as long-term, a contract whose potential span is little more than a year does not by itself suffice.

Furthermore, the actual course of dealing between the parties did not evolve into a long-term business relationship. The two began negotiations in February of 2004 and signed the contracts shortly thereafter. Although the parties have not submitted evidence establishing an actual time line for the deployment of Turbine's personnel to Iraq, Turbine's pleadings indicate that its

---

[19]Plaintiff's First Amended Complaint, Docket Entry No. 31, ¶ 16, p. 5.

[20]Purchase Order contract, ¶ 8.0, p. 5, contained in Plaintiff's Response, Docket Entry No. 2, Exhibit D attached thereto.

personnel remained in Iraq for about two months.[21]   There is no indication that the parties had any further productive dealings after Turbine's representatives left Iraq.  This lawsuit was filed on June 22, 2005.  The contract, which did not envisage a long-term relationship between the parties, did not in fact create one.

Turbine cites <u>Enviro Petroleum, Inc. v. Kondur Petroleum, S.A.</u>, 79 F.Supp.2d 720 (S.D. Tex. 1999), as presenting a strikingly similar factual situation where the court concluded that there were sufficient minimum contacts to support specific jurisdiction. However, the facts in <u>Enviro Petroleum</u> are distinguishable from the facts in this case.  <u>Enviro Petroleum</u> involved significant contract performance in Texas through overseeing design and construction of an entire oil refinery that was later to be shipped out of state. <u>Id.</u>  Here, although some preliminary procurement and testing took place in Texas, the performance of the primary contract between the parties was for the sale and servicing of equipment in Iraq.[22]

Nor do the quantum meruit and fraudulent inducement causes of action establish an independent basis for specific jurisdiction.

---

[21]Plaintiff's First Amended Complaint, Docket Entry No. 31, ¶ 16, p. 5.

[22]Turbine also cites <u>Sydow v. Acheson & Co.</u>, 81 F.Supp.2d 758 (S.D. Tex. 2000), a case in which the court found personal jurisdiction in Texas.   <u>Sydow</u> is also distinguishable.   The defendants in <u>Sydow</u> sought out the services of plaintiffs in Texas and entered into agreements requiring plaintiffs to perform a substantial portion of their contractual obligations in Texas.

The quantum meruit cause of action is based on an allegation that RMS failed to meet its contractual obligations, yet pressured Turbine to get the Plant in Iraq up and running, resulting in Turbine's performing work it was not obligated to perform under the contract.  The quantum meruit claim arises from the same set of operative facts as the breach of contract cause of action.  Just as RMS's contacts with Texas do not constitute purposeful availment for the breach of contract cause of action, they do not constitute purposeful availment for the quantum meruit cause of action.

Turbine's complaint also alleges that RMS fraudulently induced it to enter into a contract to provide goods and services with no intention of providing the services the contract required of RMS.  An out-of-state defendant's communications with a party in a forum can be relevant to personal jurisdiction if the content of the communication has a direct connection to the causes of action asserted.  See Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208, 213 (5th Cir. 1999).  However, "[f]oreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts toward the forum."  Id. at 212.  While Turbine has presented extensive argument related to RMS's activities directed toward Texas in relation to the contract, it has not presented any evidence that RMS's activities directed toward Texas relate to the fraudulent inducement cause of action.  In fact, Turbine's responsive pleadings are devoid of argument on this issue.  Absent

-24-

evidence regarding what activity or communication RMS directed toward Texas that fraudulently induced Turbine to enter into a contract with RMS, there is no prima facie case for specific jurisdiction on this tort.

Turbine has failed to establish that RMS had minimum contacts with the state of Texas sufficient to subject it to specific jurisdiction.  Because the minimum contacts prong of the jurisdiction analysis is not met, the court need not address the second prong, whether the exercise of jurisdiction over RMS offends traditional notions of fair play and substantive justice.  See Asahi Metal Ind. v. Superior Court, 107 S.Ct. 1026, 1033 (1987).[23]

## IV.   **Motion for Sanctions**

Turbine's Motion for Rule 11 sanctions is based on its argument that RMS's Motion to Dismiss for lack of personal jurisdiction was frivolous and baseless and on an allegation that RMS is attempting to hide its contacts with Texas from the court. FED. R. CIV. P. 11 requires that in signing a pleading an attorney certifies that (1) the attorney has conducted a reasonable inquiry into the facts that support the document, (2) the attorney has conducted a reasonable inquiry into the law, and (3) the motion is not interposed for the purposes of delay, harassment, or increasing

---

[23]Because the court has found that it lacks personal jurisdiction over RMS, it need not address RMS's argument that venue is improper in this district.

costs of litigation.  <u>Id.</u>  <u>See also</u> <u>Thomas Capital Sec. Servs.,</u> <u>Inc.</u>, 836 F.2d 866, 873-74 (5th Cir. 1988).  Rule 11 review evaluates an attorney's conduct at the time the document in question is signed.  <u>Id.</u>

Because the court has determined that it does not have personal jurisdiction over RMS, Turbine's argument that RMS's Motion to Dismiss was frivolous is without merit.  Although several of RMS's contacts with Texas were not revealed until discovery and after the initial motion to dismiss was filed, the court is not persuaded that this was due to the failure of RMS's counsel to perform a reasonable inquiry into the facts.  Therefore, Turbine's Motion for Sanctions will be denied.

## V.  <u>Conclusions and Order</u>

For the reasons explained above, the court concludes that it lacks personal jurisdiction over defendant RMS.  Defendant's Motion to Dismiss Plaintiff's Claims for Lack of Personal Jurisdiction (Docket Entry No. 9) is therefore **GRANTED**.  Plaintiff Turbine's Motion for Sanctions (Docket Entry No. 25) is **DENIED**.

**SIGNED** at Houston, Texas, on this 6th day of February, 2006.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

-26-